

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BOBBY EARL WOODS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 4:11-CV-823-A |
| | § | |
| RICK THALER, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

### MEMORANDUM OPINION
### and
### ORDER

This is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner, Bobby Earl Woods, a state prisoner currently incarcerated in Huntsville, Texas, against Rick Thaler, Director of the Texas Department of Criminal Justice, Correctional Institutions Division, respondent. After having considered the pleadings, state court records, and relief sought by petitioner, the court has concluded that the petition should be denied.

### I. Factual and Procedural History

In 2007 petitioner was convicted by a jury of murder in Tarrant County, Texas, and sentenced to fifty years' confinement.

(State Habeas R. at 71)[1]  Petitioner appealed, but the Eighth District Court of Appeals of Texas affirmed the trial court's judgment, and the Texas Court of Criminal Appeals refused petitioner's petition for discretionary review.  *Woods v. State*, No. 08-07-203-CR, slip op., 2009 WL 3790013 (Tex. App.-El Paso Nov. 12, 2009) (not designated for publication); *Woods v. State*, PDR No. 1772-09.  Petitioner filed a state application for writ of habeas corpus, raising the claims presented herein, which the Texas Court of Criminal Appeals denied without written order. (State Habeas R. at cover)

The state appellate court summarized the facts of the case as follows:

> On June 9, 1990, the body of Jane Thompson, a single mother of two, was found under a pile of debris on the east side of Fort Worth, in an undeveloped and wooded area just off of Sartain Drive.  There was a blood stain in the street and a trail of blood leading toward the body.  Thompson died as the result of blunt force trauma to the back of her head.  Her injuries were consistent with having been struck with the butt of a shotgun.  At the time her body was discovered, Thompson had been missing several days.  The police investigated the murder and considered Appellant a suspect, but they did not arrest him until the case was re-opened sixteen years later.

> Thompson had lived with her two sons, 14-year-old

---

[1] "State Habeas R." refers to the court record for petitioner's state habeas application No. WR-76,407-01.

Vol, and 2 1/2-year-old Josh.  Appellant is Josh's
father.  Thompson had ended her romantic relationship
with Appellant three months prior to her death and he
had moved out of her apartment.  But she continued to
have contact with him because of their son and because
she relied on Appellant for transportation since she
didn't drive.

Larry Moore worked as the general maintenance man
at the apartment complex where Thompson and the
children lived.  He knew Appellant had moved out of
Thompson's apartment a few months earlier.  A month
before her death, Thompson told Moore that she had been
trying to break away from Appellant, but he had
threatened that if he could not have her, then nobody
could.  On the day she disappeared, Thompson told Moore
that she was going with Appellant to get food stamps.
He saw Thompson and Josh leave with Appellant in his
tan and gold Pontiac.  He recalled they left at 5:30
p.m. and Moore left for home shortly thereafter.  Moore
gave police a written statement and portions of it were
admitted at trial as a recorded recollection.

Thompson disappeared on Vol's last day of school.
She had told him to take the bus and wait for her at
his grandmother's house because she planned to take him
somewhere special.  Vol missed the bus and was late
arriving at his grandmother's house.  He was not
concerned at first, and he fixed something to eat and
watched television for awhile.  His grandparents came
home at around 8 p.m., but Thompson still had not
arrived.  The family knew something was wrong because
Thompson was extremely punctual and it was not like her
to leave Vol at his grandmother's house without
calling.  Later that evening, Appellant brought Josh to
the house and announced that Thompson was missing.  He
did not stay long.

LaVonda Drake had been friends with Thompson for
several years and they lived in the same apartment
complex.  A few days before Thompson vanished, Drake
saw Appellant's car parked near the complex but out of
view from Thompson's door.  Appellant sat on the hood

of his car and watched for hours even though it was hot. On the day Thompson went missing, Drake had just put her children to bed at around 9 p.m. when Appellant knocked loudly on her door. He appeared nervous and was wringing his hands. He told her he had taken Thompson to get food stamps and left to get gas. When he returned, Thompson was gone. Drake doubted his story because she knew there was a gas station right across the street from the food stamp office. Drake offered to go with him to search for Thompson, but he refused her help. Drake noticed that Appellant was in a small red car instead of the one he usually drove. When she saw Josh in the front seat, she offered to keep him until Thompson returned home. Appellant refused that offer as well. Drake asked what Thompson had been wearing and Appellant left quickly after describing her clothing. Drake knew that Thompson did not usually leave Josh with anyone. Concerned and uneasy, Drake called Thompson's mother and spoke to Gwen Diggs, Thompson's sister. She told Diggs about her conversation with Appellant and that she felt something was wrong.

Diggs found out that Thompson was missing when Vol called that evening and asked if she had seen her. She told him she had not. After speaking with her mother, Diggs went over to the house. When she arrived, she saw Appellant sitting outside in his car. He got out of his car to talk to her, but Diggs did not want to speak with him and went straight inside. Appellant remained outside for a while. The family called the police and searched for Thompson themselves that evening.

The next morning, Thompson's sisters spoke with Josh about what had happened the day before and asked him if he had seen his mother. He said, "My mama is hurt, my mama is hurting." Diggs asked Josh where his mother was and he said, "My daddy hit my mother." He also said that his mother was running and saying "Oh Lord, oh Lord, help me." Diggs asked him what was wrong with her and Josh imitated how his mother was limping. He then said, "He shoot my mama, he shoot my

mama." Upon hearing this, the family took Josh to the
police station where he was interviewed. Josh was
nineteen at the time of trial. He testified about his
memories of the day his mother was hurt. He recalled
that someone took him out of the car and placed him on
the ground. His mother was also on the ground and he
saw Appellant hitting her in the head with something in
his hand. He next remembered being placed in the car
and he looked out the window and saw his mother covered
with leaves and sticks. When his father got in the
car, Josh asked where his mother was and Appellant told
him that she was fine. Josh recalled there was a purse
on his lap and it had blood on it. The next thing Josh
remembered was being at his grandmother's house.

Detective Phillip Roe worked homicide in 1990 and
he was given a missing person's report on the afternoon
of June 6, 1990. Roe spoke with Appellant on June 7
and took his written statement. Appellant said he
spoke to Thompson on June 5 about their work schedules
because she was having trouble getting to work.
Appellant went to pick up Josh from day care that
afternoon, but Thompson had already picked him up. He
went to her apartment and Thompson said she needed food
stamps. Appellant, Thompson, and Josh got in
Appellant's car and headed for the check-cashing place
on Seminary Drive. As they pulled into the parking
lot, Thompson saw someone she knew. She then went
inside the check-cashing place while Appellant and Josh
left to get gas and go to Pep Boys. When they returned
eight to ten minutes later, Thompson was gone.
Appellant looked around the area for her but couldn't
find her. He drove to her apartment and talked to her
neighbors. He also went to Drake's apartment and
talked to her. At the time he gave the statement,
Appellant had an injury to his hand but he explained
that he had injured it at work on the day Thompson went
missing.

As part of his investigation in 1990, Detective
Roe went to the check-cashing and food stamp office
where Thompson supposedly had gone. He reviewed the
office records and could find nothing to indicate

5

Thompson had been there on June 5.  Roe spoke with
Appellant again after Thompson's body was found and
Appellant denied killing her.  On June 14, 1990,
Detective Roe was contacted by the creditor who owned
the note on Appellant's tan and brown Pontiac because
they were trying to locate the vehicle.

Appellant's nephew, Tony Pratt, was also
questioned in 1990.  When Thompson told Appellant to
move out of her apartment, he moved in with Pratt and
Pratt's mother.  Pratt explained that Appellant was
addicted to crack cocaine.  Pratt sold it to support
his own drug habits.  Pratt accompanied Appellant when
he broke into Thompson's apartment shortly before her
death.  They ate food from her refrigerator and took a
Playstation and a television.  The day before Thompson
went missing, Appellant told Pratt that Thompson had
some money but she refused to give him any.  He
recalled that on the day Thompson disappeared, she had
been to his apartment with Appellant and Josh.  They
appeared angry and were not speaking to one another.
They left for the food stamp office but Appellant
returned an hour or so later saying she was missing.
Pratt noticed that Appellant was nervous and his
clothes were all wrinkled and "messed up" which is not
how he had looked earlier in the evening.  Appellant
had money when he returned.  Appellant told Pratt that
he was going to take Josh to his grandmother's house.
The next time Pratt saw Appellant, he was in the
parking lot of the apartment complex.  Appellant was
"spaced out in his own world" but not like he was high.
Appellant talked about Thompson as if he would never
see her again.  He also kept mumbling the word
"Spartain."  Later that evening, Thompson's brother
came to the apartment complex and accused Appellant of
killing Thompson.  The police were called and the
brother left.  After everything calmed down, Appellant
told Pratt that he had taken Thompson to a field and
told her he saw a rabbit.  He got the shotgun out of
the trunk, told Thompson to turn around, and hit her in
the head with the shotgun.  Appellant said Thompson
urinated on herself and was moaning.  Pratt knew that
Appellant had a sawed-off shotgun which he kept in the

trunk of his car.  Appellant told Pratt that Josh was
with him when he killed Thompson.  Pratt did not tell
the police in 1990 about this confession because
Appellant was his uncle and he did not want him to go
to jail.  Pratt explained that he had revealed this
information to the police more recently because it had
been on his conscience.  He also admitted he was more
willing to testify about all of these events after the
prosecutor explained to him that he could not be
prosecuted for the drug dealing and burglary he had
committed in 1990 because the statute of limitations
for those offenses had expired.

Detective Manny Reyes, who is assigned to the cold
case unit, interviewed Pratt in 2006 after the case was
re-opened. Reyes obtained an arrest warrant for
Appellant, who subsequently gave Reyes a statement
which deviated significantly from the statement he had
made in 1990. This time, Appellant claimed that
Thompson went into a fashion boutique and he had gone
to Dairy Queen and Pep Boys. He told Reyes he returned
after about an hour. Appellant also told Reyes that
someone told him Thompson had gotten in a car with two
guys. Appellant claimed he had made a missing person's
report from a payphone on Seminary, but the police
department's records did not show he had made a report.
The report came from the residence of Thompson's
mother.

Appellant testified in his own defense.  He
admitted the statement he gave to Detective Reyes in
2006 was false.  He fabricated the statement because he
was afraid and because he did not remember having given
a statement in 1990.  Consistent with his 1990
statement, Appellant testified he took Thompson to get
food stamps and he dropped her off while he went to get
gas and to Pep Boys.  When he returned, Thompson was
not there.  He went inside the check-cashing store and
drove around the area looking for her.  Appellant
denied killing Thompson and he also denied telling
Pratt he had killed her.  He denied being addicted to
crack cocaine or even using it.  On cross-examination,
Appellant took issue with the prosecutor's

characterization of his 2006 statement as a lie and
said it was the truth "in [his] mind at that time."
But he admitted that if he had been given a chance to
read his 1990 statement, his 2006 statement would have
conformed to it.

During rebuttal, the State offered the testimony
of Cheryl Carey Gregg. Appellant and Gregg have a
twelve-year-old daughter and lived together for about a
year and a half. During the time she knew Appellant,
he used crack cocaine daily and was addicted to it. On
a few occasions when they argued, Appellant told Gregg
that he had a wife who had been killed and they never
found the killer. Gregg took this statement as a
threat.

(State Habeas R. at 73-79) (footnotes omitted)

## II.  Issues

Petitioner raises three grounds for habeas relief, in which

he claims the trial court erred by (1) admitting prejudicial

hearsay of a two-year-old child under no proffered exception, (2)

admitting a written statement as a recorded recollection which

included prejudicial double hearsay, and (3) admitting the

extraneous offense of burglary.[2]  (Pet. at 7; Pet'r Mem., Table

---

[2]Within petitioner's primary grounds for relief, he also
asserts that Tony Pratt's credibility "is in serious doubt"
because he recanted his testimony, that the evidence was legally
insufficient to support his conviction, and that he is actually
innocent of the offense. (Pet'r Mem. at 15-16)  Such claims are
multifarious and improperly briefed. Nevertheless, even if the
court were to consider the claims, federal habeas relief would
not be warranted. Petitioner presents no evidence, *via* affidavit
or otherwise, in support of his assertion that Pratt recanted his
testimony after the fact, and the record provides none.

of Contents at ii & pp. 8-25)

### III.   Rule 5 Statement

Respondent believes that petitioner has sufficiently exhausted his state court remedies as required by 28 U.S.C. § 2254(b)(1) and that the petition it neither barred by limitations or subject to the successive-petition bar.   28 U.S.C. § 2244(b), (d).   (Resp't Ans. at 8)

### IV.   Discussion

#### A.   *Legal Standard for Granting Habeas Corpus Relief*

Under 28 U.S.C. § 2254(d), a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless he shows that the prior adjudication:   (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

---

Further, insufficiency of the evidence claims are not cognizable in state habeas proceedings, and the Fifth Circuit has recognized that a claim of insufficiency of the evidence is procedurally barred if a petitioner fails to exhaust the claim on direct appeal. *West v. Johnson*, 92 F.3d 1385, 1398 n.18 (5th Cir. 1996). Finally, claims of actual innocence, whether based upon existing or newly discovered evidence, have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the state criminal proceeding. *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000); *Herrera v. Collins*, 506 U.S. 390, 400 (1993).

clearly established federal law, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court.  28 U.S.C. § 2254(d).  A decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court of the United States on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see also Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  A state court decision will be an unreasonable application of clearly established federal law if it correctly identifies the applicable rule but applies it unreasonably to the facts of the case. *Williams*, 529 U.S. at 407-08.

Further, federal courts give great deference to a state court's factual findings.  *Hill*, 210 F.3d at 485.  Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct.  28 U.S.C. § 2254(e)(1).  The applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Typically, when the Texas Court of Criminal Appeals denies relief in a state habeas corpus application

without written order, it is an adjudication on the merits.
*Barrientes v. Johnson*, 221 F.3d 741, 779-80 (5th Cir. 2000); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997)

**B.    *Evidentiary Rulings***

Generally, errors of state law, including evidentiary errors, are not cognizable on habeas corpus review. *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir.1992). An erroneous state court evidentiary ruling presents a cognizable habeas claim only if the ruling violates a specific federal constitutional right or renders the petitioner's trial fundamentally unfair. *Cupit v. Whitley*, 28 F.3d 532, 536 (5th Cir. 1994); *Pemberton v. Collins*, 991 F.2d 1218, 1226 (5th Cir. 1993). In addressing petitioner's claims, the state courts relied solely on Texas law and evidentiary rules.

Petitioner claims the trial court erred by admitting, over his objection, Gwen Diggs's testimony regarding hearsay statements of Joshua Thompson when he was two years old because the testimony did not fall under any legal hearsay exception under Texas Rule of Evidence 803 and because the testimony was fabricated by the victim's family over the intervening 17-year period. (Pet. at 7; Pet'r Mem. at 8-12; RR, vol. 3, at 200-01)

What is and is not hearsay evidence in a state trial is

11

governed by the relevant state rules of evidence.  The state appellate court addressed this claim as follows:

> Appellant challenges the admission of Diggs' testimony relating what Josh told her the morning after Thompson disappeared.  The trial court overruled Appellant's hearsay objection.  On appeal, the State contends the evidence is admissible under Rule of Evidence 803(1) as a present sense impression.
>
> A present sense impression is a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.  It is undisputed that Josh made the statements the following morning in response to questioning by his aunts.  This does not satisfy Rule 803(1)'s requirement that the statement have been made at the time the declarant was perceiving the event or immediately thereafter.
>
> The State also maintains that Diggs' testimony was not hearsay because it was a prior consistent statement offered to rebut an express or implied charge of recent fabrication, improper influence, or motive.  Appellant challenged Josh's credibility throughout the trial and sought to establish through more than one family member that Thompson's murder and the family's suspicions about Appellant's culpability had been regularly discussed at family gatherings over the years.  The implication of this attack was clear even before Josh testified:  Josh's present memories about the event were recently fabricated and had been influenced by the family in the intervening years.  The record reflects that Josh's statements were consistent with his trial testimony and were made prior to the time that the supposed improper influence or motive to falsify arose.  As such, the statements were not hearsay and were admissible under Rule 801(e)(1)(B).

*Woods*, 2009 WL 3790013, at *6 (citations omitted).

*Second*, petitioner claims the trial court erred by admitting

a written statement as a recorded recollection which included

prejudicial double hearsay statements.   (Pet. at 7; Pet'r Mem. at

12-14B)   Specifically, he complains of Larry Moore's testimony

that the victim told him petitioner had threatened that if he

could not have her, then nobody could.   The appellate court

addressed this claim as follows:

> Appellant contends that the trial court erred by
> admitting Larry Moore's written statement.   He offers
> two reasons why the statement should have been
> excluded:   (1) the State failed to lay the proper
> predicate under Texas Rule of Evidence 803(5); and (2)
> the written statement included double-hearsay or
> "hearsay within hearsay."

### Preservation of Error

> The State specifically offered Moore's statement
> as a recorded recollection pursuant to the Texas Rules
> of Evidence.   Appellant made several objections to the
> contents of the written statement, but he did not
> object that the State had failed to lay the proper
> predicate under Rule 803(5).   This argument is waived.

### Hearsay within Hearsay

> We review the trial court's decision to admit or
> exclude evidence for an abuse of discretion.   We will
> not disturb the trial court's judgment unless it falls
> outside the zone of reasonable disagreement.   Hearsay
> statements are generally inadmissible unless the
> statement falls within a recognized exception to the
> hearsay rule.   Hearsay included within hearsay is not
> excluded if each portion of the combined statement
> falls within an exception to the hearsay rule.

> Appellant raised a hearsay objection to the
> following portion of Moore's written statement:   About

13

a month ago, Jane Thompson told me that she was still trying to break away from Bobby Woods and that Bobby told her that if he could not have her, then nobody could have her.

In examining the admissibility of this statement, we will consider:  (1) Thompson's statement that she was trying to break away from Appellant, and (2) Appellant's statement that if he could not have Thompson, then no one could.  Both parts of this statement are hearsay because they were offered to prove the truth of the matter asserted, namely, that Thompson had ended her romantic relationship with Appellant and Appellant had made a threat against Thompson because the relationship had ended.  The state does not argue that this statement falls within any exception to the hearsay rule.  Instead, the State contends that Thompson's statement is admissible because Appellant waived his right of confrontation by killing her.  The State cites *Gonzalez v. State* in support of this argument.  There, the Court of Criminal Appeals considered whether the admission of the dying victim's statement describing her assailant violated the defendant's constitutional right to confrontation. The statements had been admitted over the defendant's hearsay and confrontation clause objections.  The San Antonio Court of Appeals held that the victim's statements were excited utterances.  It also held that the defendant had waived his right to confrontation under the doctrine of forfeiture by wrongdoing. Following an extensive analysis of the doctrine, the Court of Criminal Appeals affirmed because the record supported a conclusion that the victim's murder was motivated at least in part by the defendant's desire to permanently silence her and prevent her from identifying him.

The State's reliance on *Gonzalez* is misplaced because it does not stand for the proposition that the forfeiture-by-wrongdoing doctrine is an exception to the hearsay rule.  It applies to an objection based on a confrontation clause violation.  Accordingly, we find that the trial court abused its discretion by

overruling Appellant's hearsay objection to this
portion of Moore's statement.

The erroneous admission of hearsay is not of
constitutional dimension.  Thus, the appropriate harm
analysis is set out in Rule 44.2(b) of the Texas Rules
of Appellate Procedure, which dictates that a
non-constitutional error "that does not affect
substantial rights must be disregarded."  Under this
standard, error is reversible only when it has a
substantial and injurious effect or influence in
determining the jury's verdict.  In conducting the harm
analysis, an appellate court should consider everything
in the record, including any testimony or physical
evidence admitted for the jury's consideration, the
trial court's instructions to the jury, the State's
theory, any defensive theories, closing arguments, and
even voir dire if material to the appellant's claim.
The factors to be considered are the nature of the
evidence supporting the verdict, the character of the
alleged error, and how the evidence might be considered
in connection with the other evidence in the case.  The
weight of the evidence of appellant's guilt is also
relevant.  Moreover, improper admission of evidence
does not constitute reversible error if the same facts
are proved by other properly admitted evidence.
Substantial rights are not affected by the erroneous
admission of evidence if the appellate court, after
examining the record as a whole, has fair assurance
that the error did not influence the finder of fact, or
had but a slight effect.

Admission of the first part of the hearsay
statement is harmless because other witnesses testified
that Thompson had ended her romantic relationship with
Appellant.  The second portion of the statement
indicated one possible motive for the murder of
Thompson, that is, Appellant's desire to possess her,
but other evidence supported a different motive for the
murder, namely, Appellant's need for money to support
his addiction to crack cocaine.  At any rate, the State
did not refer to the inadmissible hearsay testimony in
final argument but instead focused on Josh's testimony,

the contradictory stories told by Appellant, and
Appellant's confession to Pratt.  Given the strength of
that evidence and the arguments relied on by the State,
we are unpersuaded that the hearsay statement had a
substantial and injurious effect on or influenced the
jury's verdict.

*Id.* at *5-6 (citations omitted).

Lastly, petitioner claims the trial court erred by admitting

evidence of an extraneous offense.  The appellate court addressed

this claim as follows:

Appellant argues the trial court erred by
admitting extraneous offense evidence that Appellant
burglarized the victim's apartment.  As a rule, an
accused may not be tried for some collateral crime or
for being a criminal generally.  In the face of a
proper objection, evidence of other wrongful acts is
not admissible to prove the character of the person to
establish that he acted accordingly regarding the
alleged offense.  An extraneous offense may be
admissible, however, if it has relevance apart from its
tendency to prove the character of a person in order to
show that he acted in conformity therewith.  Evidence
which logically serves such purposes as "proof of
motive, opportunity, intent, preparation, plan,
knowledge, identity, or absence of mistake or accident"
is relevant beyond its tendency to prove conforming
character.  In a murder prosecution, evidence relating
to the previous relationship between the defendant and
the deceased is admissible, as is evidence relating to
the condition of the defendant's mind at the time of
the offense [under article 38.36(a) of the Texas Code
of Criminal Procedure].  The nature of the
relationship-such as whether the victim and the accused
were friends, were co-workers, were married, estranged,
separated, or divorcing-is clearly admissible under
this article.

The State offered evidence at trial that Thompson

had ended her romantic relationship with Appellant and that he had not been living in Thompson's apartment for at least a month prior to her death.  Other evidence showed that her apartment had been burglarized about a month before her death.  Pratt testified over objection that he and Appellant had committed the burglary and had taken electronics.  Appellant had attempted to portray his relationship with Thompson as amiable and supportive.  His commission of this offense rebuts that idea and illuminates the true nature of their relationship.  The burglary evidence is relevant to show Appellant's state of mind at the time of the offense when it is considered with Pratt's testimony that the day before the murder Appellant was unhappy that Thompson had money but would not give him any.  The burglary evidence is also relevant to a possible motive for the murder, that is, obtaining money to support Appellant's crack cocaine addiction.  The trial court did not abuse its discretion by admitting the burglary evidence.

*Id*, at *7 (citations omitted).

Petitioner has not shown that the appellate court's application of Texas law and evidentiary rules is incorrect or that admission of the complained-of testimony violated a specific federal constitutional right or rendered his trial fundamentally unfair–*i.e.,* that the jury would have issued a different verdict without the testimony.  It is not "the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Nor has petitioner demonstrated that the state courts' adjudication of the claims was contrary to, or involved an unreasonable

17

application of, clearly established federal law or was based on
an unreasonable determination of the facts in light of the
evidence presented in the state court.

### (C) *Evidentiary Hearing*

Petitioner's claims were adjudicated on the merits in state
court, and he has failed to overcome the limitation of §
2254(d)(1) on the record that was before the state court. *Cullen
v. Pinholster*, — U.S. —, 131 S. Ct. 1388, 1398-1401 (2011).
Thus, no evidentiary hearing is warranted.

For the reasons discussed herein,

The court ORDERS the petition of petitioner for a writ of
habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby,
denied.

Pursuant to Rule 22(b) of the Federal Rules of Appellate
Procedure, Rule 11(a) of the Rules Governing Section 2254 Cases
in the United States District Court, and 28 U.S.C. § 2253(c), for
the reasons discussed herein, the court further ORDERS that a
certificate of appealability be, and is hereby, denied, as
petitioner has not made a substantial showing of the denial of a

constitutional right.

     SIGNED April 26, 2012.

 

JOHN McBRYDE
UNITED STATES DISTRICT JUDGE

19